**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

JEFFERIES LEVERAGED CREDIT
PRODUCTS, LLC,

                    Plaintiff,

      v.

INVICTUS GLOBAL MANAGEMENT,
LLC,

                 Defendant.

Case No: 23-cv-00114-JHR

**PLAINTIFF'S MEMORANDUM OF LAW IN**
**OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .................................................................................. 1

BACKGROUND ..................................................................................................... 5

    A.    The Market for Bankruptcy Claims ................................................... 5

    B.    Invictus, a Sophisticated and Experienced Market Participant, Agrees to Purchase $5 Million of LATAM Bankruptcy Claims............................................ 6

    C.    Invictus First Acknowledges the Trade, Then Repudiates It, and Later Offers New-Found Pretexts for Its Conduct for the First Time in Litigation............................................................................................... 8

LEGAL STANDARD ............................................................................................ 10

ARGUMENT ....................................................................................................... 11

I.    The Complaint Plausibly Alleges a Claim for Breach of Contract................................ 11

    A.    The Parties Entered Into a Legally Binding Trade. ............................. 12

        1.    The Parties' Agreement Contained All Material Terms—the Subject Matter of the Trade, the Quantity Purchased, and the Price. ...... 12

        2.    Defendant's Argument That Invictus Agreed to Purchase Only a Single $5 Million Claim Misreads the Complaint and Is Belied by Documents Attached to Defendant's Motion. ......................... 14

        3.    Defendant's Agreement Was Not Subject to Any Conditions Precedent............................................................................... 17

        4.    At a Minimum, the Parties Agreed to Negotiate Open Terms in Good Faith. ....................................................................... 21

    B.    Jefferies Was and Remains Willing to Perform................................. 22

II.    The Complaint Plausibly Alleges an Alternative Claim for Promissory Estoppel.......... 23

CONCLUSION ..................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Apex Oil Co. v. Vanguard Oil & Serv. Co.*,
  760 F.2d 417 (2d Cir. 1985)...................................................................................13

*Artists Rts. Enf't Corp. v. Est. of King*,
  2017 WL 2062988 (S.D.N.Y. May 15, 2017) ........................................................15

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)..................................................................................10, 11, 24

*Axiom Investment Advisors, LLC v. Deutsche Bank AG*,
  234 F. Supp. 3d 526 (S.D.N.Y. 2017).............................................................11, 16, 23

*Bandler v. BPCM NYC, Ltd.*,
  2014 WL 5038407 (S.D.N.Y. Sept. 29, 2014).......................................................14

*In re Bear Stearns Cos., Inc. Sec., Deriv. & ERISA Litig.*,
  763 F. Supp. 2d 423 (S.D.N.Y. 2011)...............................................................10, 11

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)........................................................................................10, 11

*Bentley v. ASM Communications, Inc.*,
  1992 WL 18802 (S.D.N.Y. Jan. 28, 1992) ............................................................19

*Brookhaven Housing Coalition v. Solomon*,
  583 F.2d 584 (2d Cir. 1978)................................................................................14

*Brown v. Cara*,
  420 F.3d 148 (2d Cir. 2005)......................................................................3, 21, 22

*Buddman Distributors, Inc. v. Labatt Importers, Inc.*,
  91 A.D.2d 838 (4th Dep't 1982).........................................................................25

*BWA Corp. v. Alltrans Exp. U.S.A., Inc.*,
  112 A.D.2d 850 (1st Dep't 1985) ........................................................................23

*Ciaramella v. Reader's Digest Ass'n Inc.*,
  131 F.3d 320 (2d Cir. 1997)...........................................................................17, 18

*Clifford R. Gray, Inc. v. LeChase Const. Servs.*,
  51 A.D.3d 1169 (3d Dep't 2008).........................................................................23

*Compass Prods. Int'l LLC v. Charter Commc'ns, Inc.*,
    2019 WL 4198586 (S.D.N.Y. Aug. 8, 2019) ........................................................................24

*Czyzewski v. Jevic Holding Corp.*,
    580 U.S. 451 (2017) .............................................................................................................5

*Darby Trading Inc. v. Shell Int'l Trading & Shipping Co.*,
    568 F. Supp. 2d 329 (S.D.N.Y. 2008) ...............................................................................24

*DCR Mtge. VI Sub I, LLC v. Peoples United Fin., Inc.*,
    148 A.D.3d 986 (2d Dep't 2017) .......................................................................................21

*Deephaven Distressed Opportunities Tradings, Ltd. v. 3V Cap. Master Fund Ltd.*,
    2011 WL 11415362 (N.Y. Sup. Ct. N.Y. Cnty., Oct 27, 2011) .........................................18

*Deephaven Distressed Opportunities Tradings, Ltd. v. 3V Capital Master Fund Ltd.*,
    100 A.D.3d 505 (1st Dep't 2012) ......................................................................................18

*Dewsnup v. Timm*,
    502 U.S. 410 (1992) .............................................................................................................6

*In re Dow Corning Corp.*,
    280 F.3d 648 (6th Cir. 2002) .............................................................................................5

*E. Consol. Properties, Inc. v. Morrie Golick Living Tr.*,
    83 A.D.3d 534 (1st Dep't 2011) ......................................................................................21

*Elhanani v. Kuzinez*,
    172 A.D.3d 590 (1st Dep't 2019) ...............................................................................24, 25

*Emigrant Bank v. UBS Real Est. Sec., Inc.*,
    49 A.D.3d 382 (1st Dep't 2008) .......................................................................................17

*Bd. of Trustees ex rel. Gen. Ret. Sys. of Detroit v. BNY Mellon, N.A.*,
    2012 WL 3930112 (S.D.N.Y. Sept. 10, 2012) ...................................................................14

*Harsco Corp. v. Segui*,
    91 F.3d 337 (2d Cir. 1996) ...............................................................................................11

*Hawkins v. MedApproach Holdings, Inc. Hawkins*,
    2018 WL 1384502 (S.D.N.Y. Mar. 15, 2018) .............................................................20, 21

*Hill v. Full 360 Inc*,
    2019 WL 1280050 (N.Y. Sup. Ct. Mar. 19, 2019) ............................................................19

*ID Beauty S.A.S. v. Coty Inc. HQs.*,
    164 A.D.3d 1186 (1st Dep't 2018) ..............................................................................23, 24

*Johnson v. Priceline.com, Inc.*,
　711 F.3d 271 (2d Cir. 2013).........................................................................................10

*Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher*,
　52 N.Y.2d 105 (1981) ............................................................................................13, 14

*Lau v. Tykoon Brand Holdings LLC*,
　2020 WL 5369255 (Sup. Ct. N.Y. Cnty. Sept. 4, 2020) ..........................................24

*In re Lehman Bros. Holdings, Inc.*,
　739 Fed. Appx. 55 (2d Cir. 2018)...........................................................................17, 18

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
　797 F.3d 160 (2d Cir. 2015).......................................................................................25

*Luitpold Pharm., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie*,
　784 F.3d 78 (2d Cir. 2015).........................................................................................16

*Luxor Cap. Grp., L.P. v. Seaport Grp. LLC*,
　148 A.D.3d 590 (1st Dep't 2017) ..............................................................................21

*Maniolos v. United States*,
　741 F. Supp. 2d 555 (S.D.N.Y. 2010).......................................................................11

*Mobile Data Shred, Inc. v. United Bank of Switz.*,
　2000 WL 351516 (S.D.N.Y. Apr. 5, 2000)................................................................24

*Novartis Pharma AG v. Incyte Corp.*,
　520 F. Supp. 3d 514 (S.D.N.Y. 2021).......................................................................10

*Pearce v. Manhattan Ensemble Theater, Inc.*,
　528 F. Supp. 2d 175 (S.D.N.Y. 2007)....................................................................4, 24

*Richard v. Glens Falls Nat. Bank*,
　2021 WL 810218 (N.D.N.Y. Mar. 3, 2021) ..............................................................16

*Stonehill Cap. Mgmt. LLC v. Bank of the W.*,
　28 N.Y.3d 439 (2016) ........................................................................................3, 11, 17

*Teachers Ins. & Annuity Ass'n of Am. v. Tribune Co.*,
　670 F. Supp. 491 (S.D.N.Y. 1987) ............................................................................21

*Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*,
　487 F.3d 89 (2d Cir. 2007).........................................................................................13

*Vectron Intern., Inc. v. Corning Oak Holding, Inc.*,
　106 A.D. 3d 1164 (3d Dep't 2013) ............................................................................16

*In re Westinghouse Elec. Co. LLC*,
    588 B.R. 347 (Bankr. S.D.N.Y. 2018) .......................................................................12, 20, 21

*Winston v. Mediafare Ent. Corp.*,
    777 F.2d 78 (2d Cir. 1986)........................................................................................ *passim*

**Statutes**

11 U.S.C. § 501 .........................................................................................................................5

11 U.S.C. § 502 .........................................................................................................................5

11 U.S.C. § 1122 .......................................................................................................................5

11 U.S.C. § 1123 .......................................................................................................................5

11 U.S.C. § 1129 .......................................................................................................................5

Fed. R. Bankr. P. 3001 ...............................................................................................................6

Fed. R. Civ. P. 8 ......................................................................................................................24

Fed. R. Civ. P. 12(b)(6)...........................................................................................................16

Fed. R. Civ. P. 15 ....................................................................................................................25

U.C.C. § 8-113 .........................................................................................................................19

U.C.C. § 8-319 .........................................................................................................................19

**Other Authorities**

Adam J. Levitin, *Bankruptcy Markets: Making Sense of Claims Trading*, 4
    Brook. J. Corp. Fin. & Com. L. 64, 70 (2010) ......................................................................6

4 Lord, Williston on Contracts § 8:6 (4th ed.).........................................................................23

Restatement (Second) of Contracts § 90.................................................................................23

Plaintiff Jefferies Leveraged Credit Products, LLC ("Plaintiff" or "Jefferies") respectfully submits this memorandum in opposition to Defendant Invictus Global Management LLC's ("Defendant" or "Invictus") motion to dismiss the Complaint.

## PRELIMINARY STATEMENT

Defendant's motion to dismiss reads like a summary judgment brief or post-trial submission.  In an attempt to escape liability for reneging on its contract with Jefferies, Defendant asks the Court to credit—at the pleadings stage—Defendant's contested interpretations of certain communications between the parties and to accept Defendant's unilateral and unsupported description of the market context in which these communications took place, all without the benefit of documentary evidence and deposition testimony developed in discovery.  These invitations are improper on a motion to dismiss, which requires the Court to accept Jefferies' plausible allegations as true and draw all reasonable inferences in Jefferies' favor.

Defendant's characterizations of the parties' communications and the market context in which they took place are also inaccurate.  Settlement of a bankruptcy claim trade is more complex, and takes significantly longer, than settlement of a publicly traded equity.  Among other things, the parties must prepare and execute trade-specific transfer documentation and provide notice of the assignment to the bankruptcy administrator.  Because bankruptcy claims are more scarce and less liquid than shares of large publicly traded companies, the seller (often a financial institution that specializes in trading such instruments) also may need to acquire additional claims from other holders to fill the trade after execution.  While the parties work through the requirements for settlement, developments in the underlying bankruptcy proceeding can substantially change the economics of a trade to one or another party's detriment (as happened here when the value of LATAM claims declined precipitously).  Absent the ability to rely on a binding trade to prevent post hoc attempts, like Defendant's, to back out of a trade that proves less profitable than

anticipated, no market participant would be willing to devote the time and effort needed to finalize settlement, and the market for bankruptcy claims would cease to function.  The parties' communications referenced in the Complaint took place against the backdrop of these well-understood norms and industry practice.  Those communications show that Defendant, like Jefferies, considered the parties' trade to be a binding contract, and Defendant's settlements of other trades, including of LATAM claims, confirm this understanding.

Defendant makes three arguments regarding Jefferies' contract claim, all of which fail.

***The Parties Agreed on All Material Terms.***  The Complaint alleges, and the parties' communications referenced therein show, that the parties reached agreement on: (i) the asset that was the subject of the trade (LATAM allowed general unsecured bankruptcy claims); (ii) the amount being sold (face amount of $5 million); and (iii) the price (68 cents on the dollar).  (Compl. ¶ 3.)  Defendant argues that no contract exists because the parties did not agree on all material terms, but New York law requires nothing more to form a binding contract.

The specific identity of the original creditors and whether the trade would be filled with a single claim or multiple claims were not material terms because, contrary to Defendant's unsupported assertions, allowed general unsecured claims within the same bankruptcy proceeding are fungible.  Every allowed general unsecured claim against a given debtor gets paid out at the same pro rata percentage of face value regardless of the identity of the original creditor or the underlying specifics of the individual claim.  In purchasing such claims the buyer makes a bet on what the percentage payout will be for that *class of claims*.  Because allowed general unsecured claims are fungible, due diligence on the original creditor is largely unnecessary, beyond confirming that the claim is in fact an allowed general unsecured claim, which can be easily confirmed on the website of the bankruptcy administrator.  Nor does a buyer have recourse against

the original creditor when a buyer purchases through an intermediary, as Defendant did here, because the buyer's counterparty on the transaction is the intermediary, not the original creditor. That is why, as the documents referenced in the Complaint show, Defendant was perfectly happy to confirm a trade for LATAM claims at a price of 68 cents on the dollar without ever asking about the identity of the original creditors or how the trade would be filled.

*There Are No Conditions Precedent.* That additional steps were necessary to settle the trade, such as negotiating documentation to transfer ownership of the claims and completing "Know Your Customer" requirements, does not vitiate the parties' agreement. Bankruptcy claim trades always require such steps to settle. If that alone were sufficient to undermine a trade, there could be no market for bankruptcy claims. In recent years, the same Invictus principals involved here settled other bankruptcy claims trades with Jefferies with an aggregate face amount of more than $40 million in the same manner, including one other trade for LATAM bankruptcy claims.

Furthermore, New York law is clear that an agreement "subject to" further actions required for consummation is nonetheless a binding agreement. *See Stonehill Cap. Mgmt. LLC v. Bank of the W.*, 28 N.Y.3d 439, 451 (2016) (holding that language making auction purchase "subject to" execution of final documentation and payment of a deposit "is not the same as a clear expression that the parties were not bound to consummate the sale and that [the defendant] could withdraw at any time, for any reason"). At the very least, the Complaint plausibly alleges a preliminary agreement obligating Defendant to engage with Jefferies and attempt to settle the trade in good faith, which Defendant breached. *See Brown v. Cara*, 420 F.3d 148, 157 (2d Cir. 2005) ("The essence of a Type II preliminary agreement is that it creates an obligation to negotiate the open issues in good faith in an attempt to reach the ultimate contractual objective within the agreed framework." (internal quotation marks and citation omitted)).

The Complaint plausibly alleges, and the communications cited therein show, the existence of a binding contract for the purchase and sale of LATAM allowed general unsecured bankruptcy claims, and Defendant's breach of its obligation to settle that trade.

***Jefferies Began Performing Under the Parties' Agreement and Remains Willing and Able to Complete Performance.***   The Complaint alleges, and the communications referenced therein show, that Jefferies performed under the parties' agreement in a number of ways, including by retaining outside counsel to prepare the necessary transfer documentation, sourcing an additional $1 million face amount of LATAM claims to fill Defendant's purchase, and holding the $4 million face amount it already owned while the market price for those claims declined precipitously.  Moreover, Jefferies remains willing and able to settle the trade as agreed.  Contrary to Defendant's argument, it is Defendant's stonewalling that has prevented settlement of the trade.

Finally, the Complaint states a claim for relief as to Jefferies' promissory estoppel claim. Defendant cites no authority—because none exists—for its contention that Jefferies cannot plead claims in the alternative for both breach of contract and promissory estoppel.  Defendant also misstates the law when it asserts that Jefferies must allege an "unconscionable injury."  *See Pearce v. Manhattan Ensemble Theater, Inc.*, 528 F. Supp. 2d 175, 181 (S.D.N.Y. 2007) ("New York courts generally do not require a showing of unconscionability where promissory estoppel is invoked to prevent injustice stemming from reliance on a gratuitous promise.").  And Jefferies has alleged such an injury.  Jefferies could have sold the original $4 million in claims to another market participant in July 2021 but instead continued to hold them on its books—to this day—so they would be available to settle the trade with Defendant.  Jefferies then spent additional funds to purchase the remaining $1 million of claims needed to settle the trade, and to pay outside counsel to prepare transfer documentation, all in reliance on Defendant's promise to settle the trade.

The Court should deny Defendant's motion to dismiss in full.

## BACKGROUND

### A.        The Market for Bankruptcy Claims

Creditors in a bankruptcy proceeding assert claims against the debtor estate by filing a proof of claim.  11 U.S.C. § 501.  In a chapter 11 (reorganization) proceeding, payment (if any) is made only on claims that are "allowed."  11 U.S.C. § 1129(b)(2).  A claim for which a creditor has filed a proof of claim "is deemed allowed, unless a party in interest" objects to the claim.  11 U.S.C. § 502(a).  If an objection is made, the bankruptcy court holds a hearing to determine whether to allow the claim.  11 U.S.C. § 502(b).  The status of every filed claim, including whether it has been allowed and in what amount, is available to the public on a website maintained by the bankruptcy administrator.[1]

A chapter 11 reorganization plan groups claims into "classes."  11 U.S.C. § 1123(a)(1); *see also Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 457 (2017) ("The Code . . . sets forth a basic system of priority, which ordinarily determines the order in which the bankruptcy court will distribute assets of the estate.").  All of the claims in a class must be "substantially similar."  11 U.S.C. § 1122(a).  Absent the consent of a claim holder, a reorganization plan must "provide the same treatment for each claim . . . of a particular class."  11 U.S.C. § 1123(a)(4); *see also In re Dow Corning Corp.*, 280 F.3d 648, 660 (6th Cir. 2002) ("Th[e] disparate treatment of members of the same class violates section 1123(a)(4)'s equal treatment requirement.").  As a practical matter, that means general unsecured claims are typically placed into the same class and receive the same pro rata recovery as a percentage of the allowed amount of each claim.

---

[1]        *See, e.g.*, https://cases.ra.kroll.com/LATAM/Home-ClaimInfo (listing claims in LATAM bankruptcy) (last accessed March 1, 2023).

The bankruptcy claims market permits a creditor who has submitted a proof of claim in a chapter 11 bankruptcy proceeding to sell that claim.  (Compl. ¶ 11.)  A creditor may wish to sell a claim because "[t]here are significant risks, costs, and delays inherent in bankruptcies.  Payouts are speculative and can take years to receive.  Selling a claim allows a creditor to 'cash out' at a certain price."  Adam J. Levitin, *Bankruptcy Markets: Making Sense of Claims Trading*, 4 BROOK. J. CORP. FIN. & COM. L. 64, 70 (2010); *see also* Compl. ¶ 11.

Because the Bankruptcy Code requirements for classifying claims mean that all allowed general unsecured claims will receive the same pro rata recovery, bankruptcy claim trades typically do not require diligence into the creditor.  Whether a general unsecured claim is paid, and in what percentage of the allowed amount, depends exclusively on the amount of money available for allocation to that class.

The purchase and sale of bankruptcy claims requires certain documentation, including assignment of claims agreements.  (Compl. ¶ 3; Mem. at 7.)  The need for such documentation arises in part from the Federal Rules of Bankruptcy Procedure, which require that evidence of a bankruptcy claim transfer be filed with the bankruptcy court.  *See* Fed. R. Bankr. P. 3001(e). Depending on the complexity of the transaction, the necessary documentation often takes significant time to complete, which creates a delay between the trade date and the settlement date. (Compl. ¶ 4.)  Market participants understand that trades nonetheless become binding when the parties agree on the price and quantity of the bankruptcy claims for the trade.  (Compl. ¶ 3.)

## B.   Invictus, a Sophisticated and Experienced Market Participant, Agrees to Purchase $5 Million of LATAM Bankruptcy Claims.

Jefferies and Invictus are regular participants in the market for bankruptcy claims.  Prior to the trade at issue, Jefferies settled 12 bankruptcy claims trades with Invictus principals Amit Patel and Cindy Chen Delano.  (Compl. ¶ 4.)

As alleged in the Complaint and further demonstrated in the exhibits appended to Defendant's motion, between July 20, 2021 and July 26, 2021, Jefferies and Invictus sent several Bloomberg messages evidencing an agreement for Invictus to buy and Jefferies to sell $5 million face amount of LATAM bankruptcy claims at a price of 68 cents on the dollar:

- <u>July 20, 2021:</u>  Patel and a Jefferies' claim representative first discuss the possibility that Invictus will purchase LATAM bankruptcy claims from Jefferies.  (Compl. ¶ 19.)

- <u>July 21, 2021:</u>  The Jefferies' claim representative tells Patel he is "working on a few million today" of LATAM claims and asks if Invictus has "any interest."  (Ex. 1 at 1.[2]) Patel responds that Invictus has interest.  (*Id.* at 2.)  The Jefferies claims representative asks "if you want to bid for 5mm allowed holdco," thereby offering to sell allowed general unsecured claims.[3]  (*Id.*)  Without requesting any further information about the claims, such as the identity of the original creditor, Patel offers to pay 67 cents on the dollar.  (*Id.*)  Jefferies makes a counteroffer of 69.5 cents on the dollar, and Patel responds with a further counteroffer of 68 cents on the dollar.  (*Id.*)  Several hours later Jefferies says "you can buy the 5mm at 68," and Patel responds "OK cool," acknowledging his agreement to purchase allowed general unsecured LATAM bankruptcy claims on the specified terms.  (Ex. 1 at 4.)  Further acknowledging that the parties had a binding agreement, Patel requests a trade confirmation.  (*Id.*)  Patel still does not request any information about the identity of the original creditor or how the trade will be filled (i.e., a single claim or multiple claims).  (*Id.*)

- <u>July 23, 2021:</u>  Again demonstrating his understanding that Jefferies and Invictus had reached a binding agreement, Patel contacts Jefferies to ask once more for a "confirm for [him] on this LatAm trade."  (Ex. 2 at 1.)  Patel again does not request any additional information about the original creditor or how the trade will be filled.

- <u>July 26, 2021:</u>  Jefferies sends Patel a trade recap memorializing that Jefferies had sold "5mm LATAM holdco claim at 68 to Invictus subject to diligence, mutually agreeable docs, and successful completion of KYC.  Thanks for the trade."  (Ex. 3 at 1.)  Patel, once again acknowledging the existence of a binding trade, thanks Jefferies for sending the recap.  (Ex. 3 at 1.)  Patel still does not ask for any further information or confirmation about the creditor or how the trade will be filled.

---

[2]    Citations to "Ex. _" refer to the exhibits to the Declaration of Amit Patel that accompanied Defendant's motion.  *See* ECF No. 10.

[3]    Under well-established industry practice, if a trader offers or seeks a type of claim other than a general unsecured claim, the trader would specify the type with "admin claim," "customer claim," "priority claim," or a similar modifier.  Industry participants understand that, absent such a modifier, the claims in question are general unsecured.

In short, as of July 26, 2021, both parties had explicitly acknowledged the existence of a "trade," and Invictus did not at any point request any information whatsoever about the identity of the original creditor or how the trade would be filled.

### C.    Invictus First Acknowledges the Trade, Then Repudiates It, and Later Offers New-Found Pretexts for Its Conduct for the First Time in Litigation.

It is common for an active participant in the bankruptcy claims market like Jefferies to enter into trades in which it agrees to sell a larger face amount of bankruptcy claims than it currently has on its books.  (Compl. ¶ 21.)  The seller then sources the additional amounts needed to settle the trade from other potential sellers, which is one of the services a firm like Jefferies provides to customers like Invictus.  (*Id.*)  Market participants know that this sourcing may take time and delay settlement, particularly when liquidity for a particular type of claim is limited, as was the case for LATAM bankruptcy claims in July 2021.  (*Id.*)  Consistent with industry custom, during the parties' negotiations over the trade, the Jefferies trade representative disclosed to Patel that Jefferies would need to source $1 million of the $5 million face amount Invictus purchased. (Compl. ¶ 20.)  Contrary to the position Invictus now takes in this litigation, Patel did not object to Jefferies filling the trade using multiple claims or insist on receiving a single claim with a face amount of $5 million.  In reliance on Invictus's binding agreement to purchase $5 million in LATAM general unsecured bankruptcy claims, Jefferies proceeded to purchase the additional $1 million of claims needed to settle the trade.  (Compl. ¶ 25.)

In the meantime, on November 8, 2021, Jefferies' outside counsel contacted Invictus to start work on the transfer documentation required to settle the trade.  (Compl. ¶ 27.)  In other transactions between the parties, the Invictus principals promptly retained outside counsel and instructed Jefferies and their outside counsel to start the settlement process.  (Compl. ¶¶ 15, 26.) For example, Invictus purchased LATAM bankruptcy claims from Jefferies in June 2021 (one

month before the transaction at issue here) on behalf of a co-investor who bore the economic risk in that transaction.  (Compl. ¶ 34.)  Invictus moved expeditiously to settle the transaction, which closed in August 2021.  (Compl. ¶ 34.)  But for the trade at issue, in which Invictus itself bore the economic risk, Invictus took no action at all to settle the parties trade for over three months.  (*Id.*)

After Jefferies' outside counsel re-sent the July 26, 2021 trade recap to Invictus on November 8, 2021, Invictus did not deny the existence of a trade.  (Compl. ¶ 28.)  Instead, Chen Delano asked:  "Okay but we didn't get anything on the claim (diligence).  Haven't seen any of it.  Will that be coming?" (Ex. 5 at 1.)  Rather than suggesting the parties did not have a binding trade, Invictus asked for diligence information to facilitate the closing of the transaction.  (Compl. ¶ 29.)

On November 10, 2021, Jefferies made clear that a portion of the $5 million would come in the form of a claim filed by one particular creditor (World Fuel).  (Ex. 5 at 1.)  Invictus again did not assert that filling the trade with multiple claims was contrary to the parties' agreement.

On December 6, 2021, Jefferies' counsel followed up with Invictus to say that it was "await[ing] remaining inventory from Jefferies," but would send information about another piece of the claim (from creditor Kayak) that Jefferies had sourced.  (Ex. 6 at 2; *see* Compl. ¶¶ 20-21.)  Yet again, Invictus did not insist that the parties' agreement was for a single claim or a specific creditor.  (Compl. ¶ 29.)  To the contrary, recognizing that Jefferies would settle the trade by providing multiple claims from multiple creditors, Invictus asked Jefferies not to send information about the individual claims "piecemeal."  (Ex. 6 at 2; Compl. ¶ 29.)  Based on Invictus's request, Jefferies did not send additional information about the transaction until it had acquired the full $5 million of LATAM claims needed to settle the trade.

On June 8, 2022, having now acquired the full $5 million of LATAM claims, Jefferies sent Invictus draft transfer documentation for those claims.  (Compl. ¶ 31; Ex. 6.)  What Invictus's

motion breathlessly characterizes as "blatantly misrepresent[ing] and disregard[ing] Ms. Chen Delano's request" not to receive the documentation piecemeal (Mem. at 9) is in reality just an innocent typo. The June 8 email from Jefferies' outside counsel provided exactly what Ms. Chen Delano requested—documentation for the full $5 million in LATAM bankruptcy claims that Jefferies would assign to Invictus. (Ex. 6; Compl. ¶ 31.) That counsel inadvertently omitted the word "not" from the cover email hardly supports Invictus's hyperbole.[4]

Invictus then responded, without explanation, that it did not recognize the trade. (Ex. 6; Compl. ¶ 31.) The market price for LATAM bankruptcy claims had decreased significantly after July 2021, making the trade a losing bet for Invictus. (Compl. ¶ 5; Mem. at 2.) Rather than honor its agreement, Invictus now seeks to foist that loss onto Jefferies—which continues to hold the $4 million in LATAM claims now worth far less than when Invictus agreed to purchase them, and even spent additional funds to acquire the remaining $1 million in LATAM claims needed to fill the trade and pay outside counsel to draft transfer documentation, all in reliance on Invictus's agreement to purchase the claims. (Compl. ¶ 36.)

## LEGAL STANDARD

To avoid dismissal, a complaint need only allege "sufficient facts, taken as true, to state a plausible claim for relief." *Novartis Pharma AG v. Incyte Corp.*, 520 F. Supp. 3d 514, 523 (S.D.N.Y. 2021) (quoting *Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 275 (2d Cir. 2013)). "In deciding a motion to dismiss a complaint for failure to state a claim . . . , the Court construes the complaint liberally and accepts as true the non-conclusory factual allegations in the complaint, and draws all reasonable inferences in the plaintiff's favor." *In re Bear Stearns Cos., Inc. Sec., Deriv.*

---

[4]     Invictus is correct, however, that this exchange "suggests what was really at play here" (Mem. at 9)—Invictus is desperately searching for any excuse to attempt to back out of what for them has become an unprofitable trade.

*& ERISA Litig.*, 763 F. Supp. 2d 423, 484 (S.D.N.Y. 2011) (discussing *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft*, 556 U.S. at 678.  To the extent that any contractual terms are ambiguous, the Court "should resolve any contractual ambiguities in favor of the plaintiff on a motion to dismiss."  *Maniolos v. United States*, 741 F. Supp. 2d 555, 567 (S.D.N.Y. 2010), *aff'd*, 469 F. App'x 56 (2d Cir. 2012) (internal quotation marks omitted).

## ARGUMENT

I. **THE COMPLAINT PLAUSIBLY ALLEGES A CLAIM FOR BREACH OF CONTRACT.**

Under New York law, "[t]o establish a prima facie breach of contract, [plaintiff] must show that [defendant] breached a binding agreement between the parties, which damaged [plaintiff]."  *Stonehill Cap. Mgmt., LLC v. Bank of the W.*, 28 N.Y.3d 439, 448 (2016).  At the pleading stage, "a complaint need only allege (1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages."  *Axiom Investment Advisors, LLC v. Deutsche Bank AG*, 234 F. Supp. 3d 526, 535 (S.D.N.Y. 2017) (quoting *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996)).  As described in detail above, Jefferies' Complaint plausibly alleges that (1) the parties agreed to trade a specific face amount of LATAM general unsecured bankruptcy claims at a specific price, as memorialized in their Bloomberg messages; (2) Jefferies performed, including by sourcing additional claims and having its outside counsel prepare transfer documentation; (3) Invictus refused to complete the transaction; and (4) Jefferies suffered damages because the market price of LATAM claims has declined significantly from the price Invictus agreed to pay.  Nothing more is required at this stage.

**A.     The Parties Entered Into a Legally Binding Trade.**

**1.     The Parties' Agreement Contained All Material Terms—the Subject Matter of the Trade, the Quantity Purchased, and the Price.**

The parties agreed to all material terms on July 21, 2022, and further confirmed that understanding, including in the July 26, 2022 trade recap.  The Bloomberg messages from both dates state the claims, price, and amount for the trade, and evidence the parties' agreement.  Faced with this clear meeting of the minds, Defendant provides no support for its argument that the "specific creditor claim to be sold" is a "material term[] necessary to create a legally enforceable contract."  (Mem. at 11-12.).  Instead, Defendant asserts, without support, that "[b]ankruptcy creditor claims are not fungible."  (Mem. at 12.)  Defendant is wrong.

In the July 21, 2021 exchange referenced in Jefferies' Complaint, Jefferies' representatives asked Patel whether he is interested in purchasing "5mm allowed holdco" claims in the LATAM bankruptcy.  Patel never provided any further specificity about the types of claims he sought to purchase, which under established industry custom meant Jefferies could fill the order using general unsecured claims (i.e., the lowest priority claims).

The Complaint also alleges that participants in the bankruptcy claims market regularly agree to sell bankruptcy claims they do not yet have on their books.  (Compl. ¶ 21; *Background pts. A-B, supra.*)  Jefferies told Invictus that was the case here.  (Compl. ¶ 20; *see also* Ex. 6 (Jefferies' outside counsel explaining that she "await[s] remaining inventory from Jefferies")).  Defendant's argument that it is not bound because it did not know the specific creditor claim (although it was still able to agree to pay exactly 68 cents on the dollar) is directly at odds with the parties' communications, as well as market custom, and should be rejected.  *See In re Westinghouse Elec. Co. LLC*, 588 B.R. 347, 365 (Bankr. S.D.N.Y. 2018) (recognizing that "custom is relevant to the extent that it provides evidence of what a party intends").

Defendant's argument is also inconsistent with its own conduct after agreeing to the trade. *See Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 96-97 (2d Cir. 2007) (noting that party's "conduct in the years after the [contract] was entered into bolsters th[e] conclusion" that "the [contract] is enforceable"); *Apex Oil Co. v. Vanguard Oil & Serv. Co.*, 760 F.2d 417, 422 (2d Cir. 1985) ("[T]he existence of a contract may be established through the conduct of the parties recognizing the contract."). In their July 2021 communications, both parties explicitly recognized the existence of a binding trade from the very outset. (Ex. 2 (Patel asking for trade confirmation "on this LatAm trade" on July 23, 2021); Compl. ¶ 22 (referencing July 23, 2021 communications); Ex. 3 (Jefferies telling Patel "Thanks for the trade" on July 26, 2021); Compl. ¶ 23 (referencing July 26, 2021 communications).) Defendant's subsequent conduct further confirms its understanding that the parties had a binding trade—Defendant never purported to disclaim the agreement when Jefferies' outside counsel notified it of "an assignment from World Fuel reflecting Jefferies purchase" to "be assign[ed] . . . pro-rata" on November 10, 2021 (Ex. 5), or when Jefferies informed it that Jefferies had acquired "a Kayak piece" to apply to the trade on December 6, 2021. Invictus's conduct flatly contradicts its litigation position.

The cases cited by Defendant do not support dismissal of Jefferies' claim. In *Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher*, for example, the New York Court of Appeals held that a price term of "annual rentals to be agreed upon" in a real estate rental renewal provision constituted an unenforceable "agreement to agree." 52 N.Y.2d 105, 109, 111 (1981). The reason was simple—there was no way for the court to ascertain the contours of the parties' agreement or what relief the plaintiff might obtain. Faced with such a provision, "a court, in intervening, would be imposing its own conception of what the parties should or might have undertaken, rather than confining itself to the implementation of a bargain to which they have mutually committed

themselves." *Id.* at 109.  No such concern applies here, where even Invictus does not argue that the parties failed to reach an agreement on price.  Defendant's other cases fare no better.[5]

At the very most, Defendant's argument attempts to introduce ambiguities into the unambiguous agreement of the parties, but any supposed ambiguities would raise questions of fact that should not be resolved at the pleading stage.  *See Bd. of Trustees ex rel. Gen. Ret. Sys. of Detroit v. BNY Mellon, N.A.*, 2012 WL 3930112, at *3 (S.D.N.Y. Sept. 10, 2012) (denying motion to dismiss where, "[i]n light of [a contractual] ambiguity, the Court will need to examine extrinsic evidence to determine the parties' intent in drafting the provision—an examination inappropriate at this early stage of the litigation"); *Bandler v. BPCM NYC, Ltd.*, 2014 WL 5038407, at *9 (S.D.N.Y. Sept. 29, 2014) ("When the provisions of the contract are susceptible to conflicting constructions and when there is also relevant extrinsic evidence of the parties' actual intent, the meaning of the provisions becomes an issue of fact . . . .").

### 2.    Defendant's Argument That Invictus Agreed to Purchase Only a Single $5 Million Claim Misreads the Complaint and Is Belied by Documents Attached to Defendant's Motion.

Defendant's argument that it is "beyond any doubt that Invictus was only considering the purchase of a single $5 million claim" (Mem. at 17) hinges entirely on a single word in a trade recap email provided five days after the parties agreed to the trade.  That is, based solely on the fact that the July 26 trade recap states "Jeff sells 5mm LATAM holdco claim at 68 to Invictus"

---

[5]     The only other case Defendant relies on for its "material terms" argument, *Brookhaven Housing Coalition v. Solomon*, involved an alleged agreement by a town board to "provide whatever programs" necessary to meeting housing needs for a federal project awarded to the town 583 F.2d 584, 593 (2d Cir. 1978).  The Second Circuit affirmed a post-trial dismissal of a breach of contract claim because plaintiffs failed to prove that the parties "expressed their intent in a manner susceptible of judicial interpretation," in part because there was no specificity about the type of "programs" to which the alleged contractual language referred.  *Id.*  Here, the parties' communications—especially viewed in light of their course of dealings and industry custom— include the requisite specificity.

(Ex. 3), Defendant argues that "the plain language of the documents" proves that "Invictus never agreed to purchase a collection of individual claims that total $5 million."   (Mem. at 17). Defendant's argument fails for at least two reasons.

*First*, Defendant's own conduct again undermines its made-for-litigation position. Jefferies' Complaint alleges that "[t]he Jefferies' salesperson disclosed this fact [that Jefferies held only $4 million of LATAM claims at the time of the Invictus trade] to Patel, who therefore understood that Jefferies would have to 'source' the remaining $1 million (i.e., Jefferies would need to acquire the remaining $1 million of LATAM claims on the secondary market)."  (Compl. ¶ 20.)  Patel nonetheless confirmed the trade several times.  (Compl. ¶¶ 22-23.)

Defendant also did not argue that it had only agreed to purchase a single $5 million claim in response to any of the multiple emails from Jefferies' outside counsel describing Jefferies' efforts to source the remaining $1 million.  To the contrary, Invictus again confirmed its agreement and encouraged Jefferies' efforts to acquire the remaining claims by asking that Jefferies "[p]lease send everything at once" rather than "piecemeal" (Ex. 6).  The allegations in Jefferies' Complaint, and the documents referenced therein, demonstrate at the very least a question of fact that warrants discovery.  *See Artists Rts. Enf't Corp. v. Est. of King*, 2017 WL 2062988, at *3 (S.D.N.Y. May 15, 2017) ("The existence and agreement upon various extrinsic terms is properly the subject of briefing or fact development at a later stage.").

*Second*, the parties' July 21, 2021 agreement provides essential price, face amount, and bankruptcy information without using either "claim" or "claims":

> [Jefferies:] saying he can offer you 5mm at 69.5
> . . .
> [Invictus:] Sorry best we could do is 68 all in
> [Jefferies:] ok let me see
> . . .

> [Jefferies:] Sorry – the latam I didn't hear back for a while but now
> came back you can buy the 5mm at 68
> [Invictus:] Ok cool

(Ex. 1.)  Invictus's recently invented interpretation of the subsequent July 26 trade recap at most introduces potential ambiguity into the agreement the parties had reached five days before.  "[I]f the Court finds ambiguity in [a] contract, it must 'resolve any contractual ambiguities in favor of the plaintiff' on a Rule 12(b)(6) motion."  *Richard v. Glens Falls Nat. Bank*, 2021 WL 810218, at *7 (N.D.N.Y. Mar. 3, 2021) (quoting *Luitpold Pharm., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie*, 784 F.3d 78, 86 (2d Cir. 2015)).

While Jefferies believes the parties' agreement is unambiguous, Jefferies' understanding of the agreement is at the very least reasonable, and "the motion must be denied to permit the parties to discover and present extrinsic evidence of the parties' intent."  *Vectron Intern., Inc. v. Corning Oak Holding, Inc.*, 106 A.D. 3d 1164, 1165 (3d Dep't 2013); *see also Axiom*, 234 F. Supp. 3d at 533 (explaining that "the claim should not be dismissed" so long as "the plaintiff has an arguable claim under the contract").  Invictus's new-found insistence that it would be an "absurd interpretation" to permit the trade to be filled with multiple claims because "it would mean that Jefferies could tender an unlimited number of small claims, each of which Invictus would have to conduct due diligence on" mischaracterizes the due diligence typically performed in a bankruptcy claim trade.  As discussed above, the identity of the original claimant is irrelevant because all allowed general unsecured claims receive the same pro rata recovery, and because the buyer's recourse for claim defects is against the seller—here, Jefferies—not the original claimant.  *See also, e.g.*, *Dewsnup v. Timm*, 502 U.S. 410, 432 (1992) (owner of allowed unsecured claims is entitled "to share in the pro rata distribution to general creditors." (Scalia, J., dissenting).)  The only diligence required is to check the website of the bankruptcy administrator to confirm the status of the claims and to perform any follow-up indicated by the administrator's records.  By

contrast, Invictus's interpretation of the July 26 trade recap improperly places "[d]isproportionate emphasis . . . on a[] single act, phrase or other expression," rather than "on the totality of all of these, given the attendant circumstances, the situation of the parties, and the objectives they were striving to attain." *Stonehill*, 28 N.Y.3d at 448-449 (quotation omitted).

Jefferies' Complaint, including the documents referenced therein, plausibly alleges that the parties intended to trade LATAM allowed general unsecured claims with a total face value of $5 million in the aggregate. Nothing more is required at this early stage in the proceedings.

**3.     Defendant's Agreement Was Not Subject to Any Conditions Precedent.**

Invictus's argument that the parties' agreement was subject to unfulfilled conditions precedent based on language in the trade recap that settlement is "subject to diligence, mutually agreeable docs, and successful completion of KYC [i.e., 'Know Your Customer' requirements]" (Mem. at 5, 13-16, 20) fails under well-established New York law.

The New York Court of Appeals has made clear that "the mere inclusion" of "formulaic language that the parties are 'subject to' some future act or event," does not demonstrate "the parties' intent not to be bound" by an agreement. *Stonehill*, 28 N.Y.3d at 451; *see also Emigrant Bank v. UBS Real Est. Sec., Inc.*, 49 A.D.3d 382, 383-84 (1st Dep't 2008) (denying motion to dismiss where Defendant argued "subject to" language evidenced an intent not to be bound). Instead, the "subject to" language merely acknowledged market reality—the parties needed to complete due diligence, execute transfer documentation, and comply with Know Your Customer requirements in order to settle the trade. "Subject to" language "is not the same as a clear expression that the parties were not bound to consummate the sale" or that Invictus "could withdraw at any time, for any reason." *Stonehill*, 28 N.Y.3d at 451; *see also In re Lehman Bros. Holdings, Inc.*, 739 Fed. Appx. 55, 56 (2d Cir. 2018) (citing *Ciaramella v. Reader's Digest Ass'n Inc.*, 131 F.3d 320, 322 (2d Cir. 1997) ("The parties' intent to be bound to a [contract] presents a

question of fact.")).

Deephaven Distressed Opportunities Tradings, Ltd. v. 3V Cap. Master Fund Ltd., is illustrative.  2011 WL 11415362 (N.Y. Sup. Ct. N.Y. Cnty., Oct 27, 2011).  In Deephaven, the defendant "purchase[d] from Deephaven certain bankruptcy trade claims" evidenced by "'Trade Confirmations' that contained the terms of the parties' trade – i.e., price, amount, identity of the asset, purchaser name, seller name."  The "only proviso" was that "the trade was subject to 'negotiation, execution and delivery' of '[a] reasonably acceptable assignment agreement . . . ."  Id. at *1-2.  The court granted the plaintiff's motion for summary judgment on its breach of contract claim, holding that "such terms of reservation are by no means incompatible with intention to be bound," and that the "the Deephaven Trade Confirmations, which contained all material terms of the trade" executed by the "sophisticated hedge funds that traded [the bankruptcy] Claim" "create[d] binding and enforceable contracts."  Id. at *3-4.  The First Department affirmed, flatly contradicting Invictus's argument that the "subject to" language requires dismissal at the pleadings stage.  Deephaven Distressed Opportunities Tradings, Ltd. v. 3V Capital Master Fund Ltd., 100 A.D.3d 505 (1st Dep't 2012).

Defendant misapplies the four-factor test described in Winston v. Mediafare Ent. Corp. 777 F.2d 78, 80 (2d Cir. 1986), which supports the existence of an intent to be bound here.

Regarding the first and third Winston factors—whether there is an express reservation of the right not to be bound in the absence of a writing and whether all of the alleged contract terms have been agreed upon—Defendant relies solely on the "subject to" language.  For the reasons discussed above, that language is not, as a matter of law, an express reservation of the right not to be bound, nor does it undermine Jefferies' allegations that the parties agreed on all material terms, i.e., asset, quantity, and price.

Regarding the second *Winston* factor—whether there has been partial performance—Defendant's assertion that there was "no partial performance on the transaction" ignores the well-pled allegations in the Complaint that Jefferies, among other things, (i) continued to hold the $4 million in LATAM claims it possessed at the time of the trade so that it could fill Defendant's order, (ii) purchased an additional $1 million in LATAM claims to complete Defendant's order, and (iii) instructed outside counsel to begin to prepare transfer documentation, which counsel did.

Regarding the fourth *Winston* factor—whether the agreement is of a type that is customarily reduced to writing—Defendant's assertion that "bankruptcy claims are akin to securities, the sales of which under New York law must be, with limited exceptions, in writing" both misstates the law and ignores the well-pled allegations of the Complaint. *Bentley v. ASM Communications, Inc.*, which Defendant cites for the proposition that New York law requires securities sales to be in writing, relied on N.Y. U.C.C. § 8-319. *See* 1992 WL 18802, at *1 (S.D.N.Y. Jan. 28, 1992) ("U.C.C. § 8-319 requires, with limited exceptions, that contracts for the sale of securities be in writing."). But that provision was repealed over 25 years ago, and the law in New York is now the opposite:

> In arguing that a contract for the sale of securities must be in writing, defendants rely on case law citing to a former section 8-319 of the Uniform Commercial Code (UCC, § ___), which stated that a "contract for the sale of securities is not enforceable . . . unless . . . there is some writing." That section was repealed, effective October 10, 1997 (L 1997, ch 566, 5, eff Oct. 10, 1997), and was replaced by section 8-113, which provides: "A contract or modification of a contract for the sale or purchase of a security is enforceable whether or not there is a writing signed or record authenticated by a party against whom enforcement is sought, even if the contract or modification is not capable of performance within one year of its making." Here, the alleged agreement constitutes a contract for the sale or purchase of a security. Therefore, pursuant to UCC § 8-113, it is enforceable whether or not it is in writing.

*Hill v. Full 360 Inc*, 2019 WL 1280050, at *6 (N.Y. Sup. Ct. Mar. 19, 2019). Defendant also ignores the allegations in the Complaint that the use of Bloomberg messages to negotiate

bankruptcy claims transactions is common, that "[t]he terms of the [parties'] contractual agreement were memorialized in IB messages," and that both the parties' course of dealings and industry practice support the existence of a binding trade.  (Compl. ¶¶ 17, 19, 35.)

Defendant's reliance on *In re Westinghouse Elec. Co. LLC* fares no better.  The court in *Westinghouse* conducted a detailed post-trial evaluation of documentary evidence, fact witness testimony, and expert testimony before deciding whether an enforceable contract existed. *Westinghouse*, 588 B.R. at 356-62.  In concluding that the parties had not entered into a binding trade, the court emphasized that (i) the communication cited as creating the binding agreement was "a conditional response, which included new terms, and which clearly communicated that an agreement on the purchase price was 'subject to' these other terms" (*id.* at 360); and (ii) there was "no evidence" that the counterparty "had any familiarity with the alleged customs of people who more regularly deal with each other in the trading of claims" (*id.* at 365).  In contrast, the transaction in this case is between experienced market participants with numerous prior transactions together, neither party sent a conditional response or demand for additional terms, and Invictus affirmatively acknowledged the existence of a trade multiple times in writing.

Defendant cites only one inapposite case applying *Winston* before the parties had taken discovery.  *Hawkins v. MedApproach Holdings, Inc.* involved a motion to enforce a settlement agreement based on handwritten notes from a meeting between counsel where next to a number of terms the parties wrote "Agreed" while other terms were marked with "subject to attorney review and discussion."   2018 WL 1384502, at *1-2 (S.D.N.Y. Mar. 15, 2018), *report and recommendation adopted*, 2018 WL 1384502 (S.D.N.Y. Mar. 15, 2018).  The District Court emphasized the terms "review and discussion" meant that the issue was "open and subject to further negotiation."  *Hawkins*, 2018 WL 1384502 at *1.  The Bloomberg communications here

leave no such open terms.

In all of the other opinions Defendant cites, the parties had taken discovery before the court ruled on the claims. *See In re Westinghouse*, 588 B.R. at 354-355 (post-trial); *Luxor Cap. Grp., L.P. v. Seaport Grp. LLC*, 148 A.D.3d 590, (1st Dep't 2017) (summary judgment); *DCR Mtge. VI Sub I, LLC v. Peoples United Fin., Inc.*, 148 A.D.3d 986 (2d Dep't 2017) (same); *E. Consol. Properties, Inc. v. Morrie Golick Living Tr.*, 83 A.D.3d 534 (1st Dep't 2011) (same).

### 4.    At a Minimum, the Parties Agreed to Negotiate Open Terms in Good Faith.

At the very least, the Complaint and documents referenced therein plausibly allege the existence of a so-called "Type II" preliminary agreement, which obligated Defendant to negotiate settlement in good faith, and the Defendant's breach thereof.

While the *Winston* factors determine whether a "Type I" preliminary agreement exists, New York law also recognizes and enforces "Type II" preliminary agreements, which "express[] mutual commitment to a contract on agreed major terms, while recognizing the existence of open terms that remain to be negotiated." *Teachers Ins. & Annuity Ass'n of Am. v. Tribune Co.*, 670 F. Supp. 491, 498 (S.D.N.Y. 1987). When parties enter into a Type II agreement, each party must "negotiate the open terms in good faith toward a final contract incorporating the agreed terms," and may not "renounc[e] the deal, abandon[] the negotiations, or insist[] on conditions that do not conform to the preliminary agreement." *Id.* New York law recognizes the need to enforce preliminary agreements because "[w]ithout such legal recognition, parties would be obliged to expend enormous sums negotiating every detail of final contract documentation before knowing whether they have an agreement, and if so, on what terms." *Id.* at 499.

Under Second Circuit precedent, the "considerations relevant to whether a preliminary agreement is a binding Type II agreement" are: "(1) whether the intent to be bound is revealed by

the language of the agreement; (2) the context of the negotiations; (3) the existence of open terms; (4) partial performance; and (5) the necessity of putting the agreement in final form, as indicated by the customary form of such transactions." *Brown v. Cara*, 420 F.3d 148, 157 (2d Cir. 2005) (quotation omitted).  Here, each of the *Brown* factors supports the existence of a Type II agreement. As discussed above in connection with the *Winston* factors, the parties' written communications executing and following up on the trade reflect an intent to be bound, Jefferies partially performed, and the customary form of such transactions involves a binding trade followed by written transfer documentation.  The "context of the negotiations"—a trade between two sophisticated parties with deep experience in the bankruptcy claims market and its practices around trade execution and settlement—further support the existence of at least a Type II agreement.  To the extent that Defendant argues there were "open terms," they were not material as explained above, and in the context of a Type II agreement any "omissions may actually support finding a binding Type II agreement."  *Cara*, 420 F.3d at 158.

Jefferies' Complaint therefore plausibly alleges, at the very least, a binding Type II preliminary agreement that Defendant breached by refusing to negotiate settlement in good faith.

## B.  Jefferies Was and Remains Willing to Perform.

Turning to the second element of a breach of contract claim, as alleged in the Complaint and explained above, to this day Jefferies holds a $5 million LATAM position for Invictus—at a considerable cost to itself.  (Compl. ¶ 30.)  In addition to the $4 million it held in inventory as of July 21, 2021, Jefferies specifically acquired an additional $1 million in LATAM claims to satisfy the parties' agreement.  (Compl. ¶ 30.)  Moreover, Jefferies made repeated attempts to settle the original transaction over the course of nearly a year, including by having its outside counsel prepare and send to Invictus draft transfer documentation for the full face amount of the trade. (Compl. ¶ 31; Ex. 6.)  It was Invictus that, in June 2022, insisted that it "does not recognize this

trade" and refused to proceed with settlement.  (Compl. ¶ 31.)  These allegations, supported by the

parties' communications referenced in the Complaint, rebut Defendant's assertion that a failure to

perform by Jefferies excuses Defendant's breach.  (Mem. at 16-18); *see Axiom*, 234 F. Supp. 3d at

535 (holding that the "Complaint also sufficiently states a claim for breach of contract" where it

"alleges that . . . [Plaintiff] performed under th[e] contracts").

## II.  THE COMPLAINT PLAUSIBLY ALLEGES AN ALTERNATIVE CLAIM FOR PROMISSORY ESTOPPEL.

The Complaint alleges that "Invictus made a clear and unambiguous promise to negotiate

transfer documentation in good faith and to settle the Transaction," a promise upon which

"Jefferies reasonably relied."  (Compl. ¶¶ 43, 45); *see Clifford R. Gray, Inc. v. LeChase Const.

Servs.*, 51 A.D.3d 1169, 1170 (3d Dep't 2008) ("[I]t must be shown that the defendant made a

clear and unambiguous promise upon which the plaintiff reasonably relied.").  As discussed above,

11 months passed in which Jefferies "(1) lack[ed] . . . knowledge of the true facts" that Invictus

did not intend to settle the trade, "(2) reli[ed] upon the conduct of" Invictus, and (3) was prejudiced

in so doing.  *BWA Corp. v. Alltrans Exp. U.S.A., Inc.*, 112 A.D.2d 850, 853 (1st Dep't 1985).

Defendant's argument that "[t]he alleged existence of [a] 'contractual agreement' . . . bars

the promissory estoppel claim" ignores that Jefferies pleads the promissory estoppel claim as an

alternative to its breach of contract claim.  New York law permits promissory estoppel and contract

claims to coexist when "Plaintiff is not asking [the] Court to enforce a contract that would

otherwise be enforceable but for lack of consideration, but [instead] to provide a remedy where

[the Court has found that] the underlying agreement fails for indefiniteness."  *Clifford R. Gray*, 51

A.D.3d at 1171 (citing Restatement (Second) of Contracts § 90, Comment a, Illustration 1; 4 Lord,

Williston on Contracts § 8:6 (4th ed.)).  Moreover, in each of the cases cited by Defendant, and

unlike here, the parties did not dispute the existence of a contract.  *See ID Beauty S.A.S. v. Coty*

*Inc. HQs.*, 164 A.D.3d 1186, 1186 (1st Dep't 2018) (dismissing promissory estoppel theory "precluded by the unambiguous contractual language contained in the invoices"); *Lau v. Tykoon Brand Holdings LLC*, 2020 WL 5369255 at *3 (Sup. Ct. N.Y. Cnty. Sept. 4, 2020) (dismissing promissory estoppel theory in case where "no party raises" "a question as to whether a valid and enforceable contract existed").[6]

Defendant's argument that Jefferies needs to plead an unconscionable injury misstates New York law, which "limit[s] promissory estoppel claims to instances of unconscionable injury *only where promissory estoppel is invoked as a defense to the Statute of Frauds.*" *Pearce v. Manhattan Ensemble Theater, Inc.*, 528 F. Supp. 2d 175, 181 (S.D.N.Y. 2007) (emphasis added); *see also Darby Trading Inc. v. Shell Int'l Trading & Shipping Co.*, 568 F. Supp. 2d 329, 341 (S.D.N.Y. 2008) ("unconscionable injury" required for promissory estoppel claim only when breach of contract claim fails by application of the statute of frauds); *Compass Prods. Int'l LLC v. Charter Commc'ns, Inc.*, 2019 WL 4198586, at *7 (S.D.N.Y. Aug. 8, 2019) ("[O]rdinary injury to the relying party suffices to state a claim.").

In any event, the Complaint plausibly alleges that Jefferies suffered an unconscionable injury.  To satisfy the "unconscionable injury" requirement, the plaintiff "must demonstrate injuries beyond those that flow naturally from [Plaintiff's] non-performance or from [its] continuing performance of the unenforceable agreement." *Mobile Data Shred, Inc. v. United Bank of Switz.*, 2000 WL 351516, at *4 (S.D.N.Y. Apr. 5, 2000); *see also Elhanani v. Kuzinez*, 172 A.D.3d 590, 592 (1st Dep't 2019) (denying motion to dismiss both breach of contract and

---

[6]     Defendant's argument that Jefferies' promissory estoppel claim fails "due to Count II's incorporation of the allegations that there was an express 'contractual agreement'" is the kind of hyper-technical reading long disfavored by federal courts.  *See Ashcroft*, 565 US. at 678 ("Rule 8 marks a notable . . . departure from the hypertechnical, code-pleading regime of a prior era").

promissory estoppel claims).  Here, the Complaint demonstrates more than just expectation damages (i.e., the difference between the agreed purchase price and the current value of the claims).  Jefferies also paid for outside counsel to work on the transaction,[7] purchased an additional $1 million face amount of LATAM bankruptcy claims, and held $4 million in LATAM bankruptcy claims as they declined in value.  These allegations are more than sufficient to warrant discovery.  *See Buddman Distributors, Inc. v. Labatt Importers, Inc.*, 91 A.D.2d 838, 839 (4th Dep't 1982) (unconscionability "should not be determined on the pleadings").

Defendant's argument that "the Complaint fails to sufficiently allege a clear and unambiguous promise" (Mem at 23) is at odds with Defendant's own argument that Jefferies promissory estoppel claim should be dismissed due to the Complaint's "allegations that there was an express contractual agreement."  (Mem at 22.)  Moreover, the Complaint clearly alleges "who made this alleged promise" (Patel); "to whom it was allegedly made" (Jefferies' claim representative); "when" (July 21, 2021); "how" and "where" (Bloomberg messages); and "what was specifically stated" (a that Defendant would pay 68 cents on the dollar for $5 million of LATAM bankruptcy claims).  (Mem. at 23.)

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss should be denied in its entirety.[8]

---

[7]     Defendant argues that Jefferies cannot recover attorneys' fees in connection with bringing this litigation.  (*See* Mem. at 24.)  Jefferies seeks to recover only the attorneys' fees it incurred in attempting to settle the transaction.

[8]     If the Court concludes that there is a defect in the Complaint, Jefferies should be granted leave to amend.  *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015) (quoting Fed. R. Civ. P. 15(a)(2)) ("[W]e hew to the liberal standard set forth in Rule 15, which states that '[t]he court should freely give leave [to amend] when justice so requires.'").

Respectfully submitted,
ORRICK, HERRINGTON & SUTCLIFFE LLP


By: */s/ David Litterine-Kaufman*
David Litterine-Kaufman
dlitterinekaufman@orrick.com
Harry F. Murphy
hmurphy@orrick.com
51 West 52nd Street
New York, New York  10019-6142
Telephone:  (212) 506-5000

*Counsel for Plaintiff*
    *Jefferies Leveraged Credit Products, LLC*

March 1, 2023